**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JAMIE L. KAUFMAN, | ) | CASE NO. 3:24-CV-2221-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Jamie L. Kaufman's application for Supplemental Security Income (SSI). Ms. Kaufman seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated December 19, 2024.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

In October 2020, Ms. Kaufman applied to the Social Security Administration (SSA) seeking SSI benefits; she initially claimed that she became disabled on January 1, 2013 (as to the SSI claim), but she later amended the SSI disability-onset date to October 16, 2020. (Tr. 103, 108, 38–39 (amending the date), 209).[2] She identified four allegedly disabling conditions: (1) bipolar disorder; (2) anxiety; (3) "manic depression"; and (4) chronic migraines. (Tr. 243.)

---

[1] Carolyn W. Colvin was serving as Acting Commissioner of Social Security when the complaint was filed. She served in that role until January 2025. A series of acting commissioners led the Agency until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 5. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 27").

The SSA denied Ms. Kaufman's application initially and upon reconsideration. (Tr. 63, 72, 83, 89, 114.) Ms. Kaufman requested a hearing before an administrative law judge (ALJ). (Tr. 118.) Her counsel submitted a brief in advance of the hearing. (Tr. 282–84.) The ALJ held a hearing on November 9, 2021, at which Ms. Kaufman was represented by counsel. (Tr. 33–62.) Ms. Kaufman testified, as did an independent vocational expert (VE). (*Id.*)

On December 17, 2021, the ALJ issued a written decision finding that Ms. Kaufman is not disabled. (Tr. 10–28.)

Ms. Kaufman requested review of the ALJ's decision. (Tr. 118, 206–07.) Her counsel submitted a letter brief to the SSA Appeals Council identifying alleged errors in that decision. (Tr. 307–08.) On November 28, 2022, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On January 26, 2023, Ms. Kaufman filed a complaint in this Court, challenging that decision. Tr. 1934; *see also Kaufman v. Comm'r of Soc. Sec.*, Case No. 1:23-cv-156 (N.D. Ohio). Ms. Kaufman and the Commissioner thereafter jointly stipulated to a remand of the matter to the Agency for further consideration. Tr. 1936–39. Ms. Kaufman submitted letters to the ALJ in April 2024 presenting argument relevant to the remand. Tr. 2029–36.

The ALJ held a second hearing on May 2, 2024, at which Ms. Kaufman and a VE testified. (Tr. 1867–1904.) The ALJ thereafter issued a second decision on August 30, 2024, again finding that Ms. Kaufman was not disabled. (Tr. 1840–59.)

---

I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 6") and page-identification numbers (e.g., "PageID# 3454").

Ms. Kaufman did not seek Appeals Council review of that decision. On December 19, 2024, Ms. Kaufman filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Kaufman asserts the following assignment of error for review:

> The ALJ failed to properly account for the restrictions opined by the state agency mental health reviewing experts.

(Pl.'s Merit Br. at 2, ECF No. 6, PageID# 3454.)

## III.    BACKGROUND[3]

### A.    Personal, Educational, and Vocational Experience

Ms. Kaufman was born in March 1987 and was 33 years old on the date of her application. (Tr. 36, 103.) She graduated high school. (Tr. 41, 244.) She has not worked meaningfully since October 2020, although she worked at a fast-food restaurant briefly in around 2023. (Tr. 41, 244, 1875.) She had previously worked for several restaurants and staffing agencies. (Tr. 42; *see also* Tr. 228–33, 244, 296.) She had a driver's license until she was 20 years old but has not had a valid license since that time. (Tr. 43.) At this time, Ms. Kaufman will either walk or use Medicaid transportation to get around. (*Id.*) She lives in a house with a roommate. (Tr. 1876.)

### B.    Function Report

Ms. Kaufman completed a function report on November 19, 2020. (Tr. 249–56.) She identified that her temper, anxiety, and depression keep her from working. (Tr. 249.)

Ms. Kaufman described having difficulty controlling her temper. (*Id.*) She wrote that she has a hard time getting along with people, including authority figures. (Tr. 253, 254.) She said she was recently fired from a job because she and her supervisor "didn't get along." (Tr. 254.) She

---

[3] As Ms. Kaufman's assignment of error is limited to non-exertional limitations stemming from her mental health conditions, I limit my summary of the evidence to that relevant to her mental conditions. I further note that Ms. Kaufman is referred to in many of the records as "Jamie Myers," presumably due to a change in marital status.

does not handle stress or changes in routine well, and she finds herself being "very moody" and "snap[ping]" at the people who are closest to her. (Tr. 255.)

With respect to anxiety, Ms. Kaufman wrote that she has panic attacks when she is in a group of people or at the grocery store. (Tr. 249; *see also* Tr. 253 ("Don't like to go places alone especially where there are large groups of people.")) She does not leave the house except to attend doctor's appointments or go to the store for groceries and household supplies. (Tr. 252.) She goes to the store around twice per month, and she does not go alone because of her anxiety. (*Id.*) She is able to take walks alone. (*Id.*) She does not drive. (*Id.*)

Ms. Kaufman wrote that her depression keeps her in bed almost all day. (Tr. 250.) She is usually able to see to her personal hygiene, but she needs reminders to take medicine and to attend appointments. (Tr. 251.) Her partner prepares all their meals and takes care of household chores. (*Id.*) Ms. Kaufman is able to help with cleaning or laundry once per week, "if that," and only if she has the motivation to get out of bed. (*Id.*) Ms. Kaufman watches television, but she has trouble focusing. (Tr. 253.) She wrote that she has trouble remembering things, sometimes several times per day. (Tr. 254.) She has a hard time completing tasks. (*Id.*) She estimated that she can pay attention for only five to ten minutes at a time. (Tr. 254.) She sometimes sleeps for 18 hours or more in a day. (Tr. 253.)

Ms. Kaufman identified that she is able to take care of a pet cat and handle money. (Tr. 250.)

In a separate submission to the Agency, Ms. Kaufman wrote that she had tried to die by suicide. (Tr. 298.)

C.    <u>**Relevant Hearing Testimony**</u>

1.    ***Ms. Kaufman's Testimony***

Ms. Kaufman is primarily troubled by migraines and her bipolar disorder. (Tr. 49.)

With respect to migraines, Ms. Kaufman has been prescribed daily gabapentin and Aimovig. (Tr. 49.) She finds that the gabapentin helps but said the Aimovig is not helping. (Tr. 49–50.) Even with the gabapentin, though, Ms. Kaufman has eight to ten migraine headaches per month. (Tr. 53.) When she has a headache, she lays down in the dark and waits for it to subside, which can take a half hour or up to two hours. (*Id.*)

With respect to her mental health conditions, Ms. Kaufman had been seeing a doctor and a therapist every two weeks. (Tr. 50–51.) Ms. Kaufman described having trouble focusing and said her "temper is off the chain." (Tr. 51.) She said she had tried to kill her husband and attempted suicide. (*Id.*) She has visual hallucinations of "things that aren't there." (Tr. 52.) She said her memory was "pretty bad." (Tr. 53.) She described that she has trouble following instructions, remembering doctor's appointments, and taking medicine. (Tr. 54.) At the first hearing, Ms. Kaufman testified that her husband reminded her about these things. (*Id.*) Ms. Kaufman's temper "flares," giving her trouble getting along with people. (*Id.*)

Ms. Kaufman is "sometimes" able to help with household cleaning, when she "can get [herself] out of bed." (Tr. 44.) She helps with laundry. (*Id.*) She does not prepare any meals; at the time of the first hearing, her husband took care of that. (Tr. 44–45.) She was able to let the family dogs outside but does not pick up after them in the yard. (Tr. 45.)

Most days, Ms. Kaufman is "really down," stays in bed, and watches television. (*Id.*) If she is having a good day, she will get up and help with chores. (*Id.*) She enjoys watching fictional police procedural television shows and finds that she is able to follow the story. (Tr. 46.) She does not read and does not usually use the internet. (*Id.*)

Ms. Kaufman testified that she does not leave the house very often and does not really go anywhere except for doctors' appointments. (*Id.*) She does not go to the grocery store very often

because there are "way too many people." (Tr. 52.) When paying at a store, Ms. Kaufman is able to ensure that she gets the correct change back. (*Id.*) She has not experienced any problems with other patients or medical staff at the doctor's office. (*Id.*)

Ms. Kaufman was on probation at the time of the first hearing and reported to a probation office every two weeks. (Tr. 46.) She was required to submit to drug testing, and her tests always came back clean. (Tr. 47.) She was completing an online probation-mandated course on criminal thinking. (Tr. 48.) She was sometimes able to actively participate, but her anxiety "sometimes g[ot] the best of [her]" so she mostly just listened. (*Id.*)

Ms. Kaufman has been prescribed Suboxone since March 2020. (Tr. 47.)

At her second hearing, Ms. Kaufman testified that she had lived with a roommate for six or seven months, and her roommate had taken over for her husband in terms of grocery shopping. (Tr. 1876.) She had successfully completed probation. (Tr. 1877–78.) She was still using cocaine "on and off" "here and there." (Tr. 1878.) She also continued to use marijuana. (Tr. 1881.) Most days, Ms. Kaufman remained in bed watching television. (Tr. 1878–79.) She remained able to care for a dog and several cats. (Tr. 1880–81.) She had recently been prescribed medicine to help her sleep. (Tr. 1882.) She continued to suffer from memory loss. (Tr. 1883.)

Ms. Kaufman described how her migraines and physical pain had gotten worse since the first hearing. (Tr. 1884–87.) She described that her mental health had been "pretty stable" since the last hearing. (Tr. 1887.) She still had panic attacks several times a day. (Tr. 1888.) She still found herself lashing out at others. (*Id.*)

### 2. *Vocational Experts' Testimony*

Mary Everts testified as a vocational expert (VE) at the first hearing. (Tr. 55.)

The ALJ asked the VE to assume that an individual with Ms. Kaufman's age and education had the ability to perform work at the medium exertional level and could occasionally climb and

stoop and frequently kneel and crouch. (Tr. 56.) The individual could have occasional exposure to concentrated loud noises and vibration but could have no exposure to unprotected heights or unprotected moving mechanical machinery. (*Id.*) The individual could understand, remember, and carry out simple routine tasks, but not at a production-rate pace. (*Id.*) The individual could make judgments on simple work and respond appropriately to a usual work situation where their duties are generally predictable. (*Id.*) The individual could handle occasional changes in a routine work setting that are explained in advance and implemented slowly. (*Id.*) The individual cannot perform work that requires a daily production quota, but they can perform goal-oriented work and meet end-of-day production requirements that include remaining on task for two-hour segments of time. (Tr. 56–57.) The individual cannot engage in direct public service work with the general public but can be in the proximity of the general public and provide basic information that does not require persuasion, negotiation, or dealing with conflicts. (Tr. 57.) The individual can have occasional interaction with coworkers and supervisors, but with coworkers the individual cannot engage in team or tandem tasks. (*Id.*)

The VE opined that such an individual could perform the work of a janitor (DOT 381.687-018), laundry worker (DOT 361.685-018), or laboratory cleaner (DOT 381.687-022). (Tr. 57–58.)

The ALJ next asked the VE to assume that the individual was limited to the light exertional level. (Tr. 58.) The VE testified that such a person could perform the work of a housekeeper (DOT 323.687-014), retail marker (DOT 209.587-034), or a general office helper (DOT 239.567-010). (Tr. 58–59.)

The VE further testified that employers typically provide two 15-minute breaks and one 30-minute break in an eight-hour workday. (Tr. 59.) Employees are expected to be on task at least

85 percent of the time they are working. (*Id.*) And employers will generally allow one instance of absence, leaving early, or coming in late per month. (*Id.*)

Ms. Kaufman's counsel asked the VE to consider a person who needed a work environment away from the distractions of others to maintain attention and concentration. (Tr. 60.) The VE opined that this would not be consistent with competitive employment outside of a disability accommodation. (*Id.*)

Suman Srinivasan testified as a VE at the second hearing. (Tr. 1892.)

The ALJ asked the VE to assume that an individual with Ms. Kaufman's age and education had the ability to perform work at the medium exertional level with a number of physical exertional limitations and several additional limitations, including: the person can understand, remember, and carry out simple tasks but not at a production-rate pace; the person can make judgments on simple work and respond appropriately to usual work situations where duties are generally stable and predictable; the person can handle occasional changes in that routine work setting that are explained in advance; the person cannot interact with the general public but can have occasional interaction with supervisors and coworkers; with respect to coworkers, the person cannot engage in team or tandem tasks; the person's interactions with coworkers must be superficial, meaning short-duration interactions that occur for a specific purpose (like work-related exchanges), although the person could engage in casual conversation. (Tr. 1893–94.)

The VE testified that such a person could perform the work of a floor waxer, hospital cleaner, or cook helper. (Tr. 1894–95.)

The ALJ next asked the VE to consider that the person from the first hypothetical was limited to the light exertional level, with certain additional exertional limitations. The VE

identified that such a person could perform the work of a merchandise marker, routing clerk, or housekeeping cleaner. (Tr. 1895.)

Ms. Kaufman's counsel asked the VE to assume that for two-thirds of the workday, the hypothetical person would be unable to interact with a supervisor. (Tr. 1899.) During that period, the person would walk away or otherwise negatively respond to that interaction. (Tr. 1898.) The VE testified that those restrictions would be work-preclusive. (Tr. 1899–1900.) The VE further testified that a person limited to "shallow and cursory" interactions would have a hard time completing job interviews, job training, and employee reviews. (Tr. 1901.)

### D.    **State Agency Consultants**

A disability examiner (K. Leite), a physician (Steve McKee), and a psychologist (Lisa Foulk, Psy.D.) reviewed Ms. Kaufman's claim at the initial review level. (Tr. 63–73.) Dr. Foulk opined that Ms. Kaufman has a moderate limitation with respect to her ability to understand, remember, or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt of manage herself. (Tr. 67.)

Dr. Foulk further found Dr. Wagner's February 15, 2021 opinion to be fully consistent with the record evidence. (Tr. 69.) Among other things, that opinion stated that Ms. Kaufman may have intellectual deficits that "would impact her ability to understand and respond to supervisory feedback" and cognitive limitations "which may negatively impact her ability to manage normal work pressures." (Tr. 734.)

Dr. Foulk opined that Ms. Kaufman had a moderate limitation with respect to her ability to understand and remember detailed instructions, but she had no significant limitation with respect to her ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. (Tr. 70.)

Dr. Foulk found that Ms. Kaufman had moderate limitations with respect to her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, work in coordination or in proximity to others without being distracted, and complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 71.) Dr. Foulk explained that Ms. Kaufman would be able to carry out repetitive, short-cycle tasks "in a setting . . where [she] can work away from others." (*Id.*)

Dr. Foulk opined that Ms. Kaufman is moderately limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 71.) Dr. Foulk explained as follows:

> Clmt can relate to coworkers and supervisors on a superficial level. Clmt can have occasional superficial interactions with the general public[,] would not be able to have responsibility for conducting any business with the public.

(Tr. 71.)

Dr. Foulk concluded that Ms. Kaufman has moderate limitations with respect to her ability to respond appropriately to changes in the work setting and to travel in unfamiliar places or use public transportation. (*Id.*)

Based in part on these conclusions, the consultants found that Ms. Kaufman was not disabled. (Tr. 72.)

In a letter to Ms. Kaufman explaining this decision, the SSA wrote that her "condition is not severe enough to keep [her] from working." (Tr. 89.)

A disability examiner (Kristy Davis), a physician (Gail Mutchler, M.D.), and a psychologist (Kristen Haskins, Psy.D.) reviewed Ms. Kaufman's claim at the reconsideration level. (Tr. 74–84.)

Dr. Haskins reviewed and concurred in Dr. Foulk's conclusions, writing that they "are consistent and supported" by the initial level documentation and by the records received at the reconsideration level. (Tr. 82.)

Accordingly, the consultants affirmed that Ms. Kaufman is not disabled. (Tr. 83.)

In a letter to Ms. Kaufman explaining this decision, the SSA wrote that "[t]he evidence . . . shows that you experience anxiety and depression[] but it does not significantly affect your ability to perform simple work related tasks." (Tr. 114.)

### E.    Relevant Medical Evidence

Records reflect that Ms. Kaufman was prescribed anti-epileptic medication for panic attacks as early as November 2018. (Tr. 324.) It seems that she stopped taking the medication until October 2019, when she requested to begin medication treatment again. (*See id.*; *see also* Tr. 327.)

At an appointment in January 2020, Ms. Kaufman reported that the medication was helping to control the panic attacks, but she was still having them five days a week. (Tr. 319–20.)

In October 2020, Ms. Kaufman consulted with Krystal Dietrich, a nurse practitioner, regarding her opioid use disorder. (Tr. 356.) Ms. Dietrich did not note any complaints of anxiety or dysphoric mood. (Tr. 357.) On examination, Ms. Kaufman was found to have normal mood, behavior, thought content, and judgment. (Tr. 358.)

In December 2020, police officers brought Ms. Kaufman to a hospital for a psychiatric evaluation. (Tr. 615.) She had "attempted to 'take pills'" but her boyfriend prevented her from swallowing any and called the police. (*Id.*) Ms. Kaufman said she had been off her medication for depression and bipolar disorder for over a year. (*Id.*) She described feeling severely depressed and said that she had "hear[d] voices." (Tr. 616.) She said this suicide attempt had been her second of the week. (Tr. 619.) On examination, Ms. Kaufman displayed poor insight and judgment. (Tr. 620.)

Later that month, Ms. Kaufman told her primary care provider that she did not believe her medication was working. (Tr. 715.)

On February 15, 2021, Ms. Kaufman underwent a psychological evaluation with disability consulting examiner Ryan Wagner, Psy.D. (Tr. 729.) Ms. Kaufman called her work history "sporadic," explaining that she had "issues with people and anxiety." (Tr. 730.) She reported being fired from prior positions because of "conflicts" and said she was concerned about her ability to handle conflicts with supervisors. (*Id.*) On examination, Dr. Wagner noted that Ms. Kaufman was tearful and depressed. (Tr. 732.) Dr. Wagner found support for diagnoses of bipolar I disorder, posttraumatic stress disorder, unspecified neurocognitive disorder, and opioid use disorder. (Tr. 733.) He described her prognosis as "guarded to poor." (*Id.*)

Ms. Kaufman consulted with her primary care doctor on March 15, 2021, Ms. Kaufman reported that her lithium prescription was helping, and her anti-anxiety medication was "really help[ing]." (Tr. 762.) Her treating doctors continued adjusting her medication through April 2021. (*See* Tr. 2132, 2127–28.) At her April 2021 appointment, Ms. Kaufman complained of worsening mood and described that she could not get out of bed because she was "always depressed." (Tr. 2127.)

On July 24, 2021, Ms. Kaufman's husband reported that Ms. Kaufman had stopped taking one of her psychiatric medications, leading to "more problems with her mood," including depression and angry outbursts. (Tr. 1313.) Four days later, on July 28, 2021, Ms. Kaufman was again hospitalized due to suicidal ideation. (Tr. 1146.) She had put an entire bottle of anticonvulsant medication into her mouth, but her husband prevented her from swallowing them. (*Id.*) She remained hospitalized for several days, after which she was discharged in stable condition. (*Id.*)

Counseling notes from August 2021 describe Ms. Kaufman as withdrawn and disheveled. (Tr. 1235.) Her speech was slurred, she admitted to experiencing auditory and visual hallucinations, and she exhibited poor insight and a blocked thought process. (Tr. 1236.)

Ms. Kaufman continued counseling through the end of 2021 and into 2022. (Tr. 2832–44.)

Ms. Kaufman consulted with Kara Reilly, a psychiatric nurse practitioner, on August 26, 2021. (Tr. 1250.) She said that her medications were not working and reported that she had "tried to strangle [her] husband" in her sleep. (*Id.*) On examination, Ms. Kaufman maintained good eye contact, spoke coherently, and had an "okay" mood, although she presented with a flat affect. (Tr. 1252.)

At a counseling appointment in September 2021, Ms. Kaufman reported that she was compliant with her medication and was "doing more around the house to help with getting more energy and motivation." (Tr. 2835.)

In February of 2022, Ms. Kaufman was continuing to work with a counselor to address issues with depression, manic episodes, anxiety, and dealing with social situations. (Tr. 2846.) In March of 2022, Ms. Kaufman reported to her counselor that she was sleeping more and gaining more weight, but she said her medication was helping with her depression and anxiety. (Tr. 2867.)

Ms. Kaufman consulted with a neurology physician assistant, Jordan Bulcher, PA-C, on April 18, 2022, regarding her headaches and reported memory loss. (Tr. 2437.) She reported that her depression medication was helping and that her anxiety was "doing well" on medication as well. (*Id.*) She complained that she was "forget[ting] things all the time." (*Id.*) On examination, Ms. Kaufman presented with normal mood and affect and was "normal in conversation." (Tr. 2438–39.) Mr. Bulcher noted that Ms. Kaufman's memory loss was "secondary to depression,

anxiety, and chronic pain." (Tr. 2439.) He started her on a medication to manage that symptom and continued to monitor her. (*Id.*; *see also, e.g.*, Tr. 2436.)

At a counseling appointment on May 12, 2022, Ms. Kaufman reported that she felt as though a new medication had helped her depression. (Tr. 2877.) She described having increased motivation and energy and said she was "able to get up." (*Id.*)

Ms. Kaufman told her counselor on June 8, 2022, that she had been working 25 to 30 hours per week at a fast-food restaurant. (Tr. 2882.) She reported that she had considered going to the hospital due to her anxiety and depression but ultimately decided against it. (*Id.*) She complained of several episodes of mania. *Id.*

At her counseling appointment on July 21, 2022, Ms. Kaufman reported that she was doing better and feeling less irritable; she said her depression was "well controlled." (Tr. 2887.) But she complained that her anxiety was "through the roof" and said she had experienced a panic attack two days ago. (*Id.*) This was her first panic attack "in a long time." (*Id.*)

Ms. Kaufman continued to complain of heightened anxiety at her counseling appointment on August 18, 2022. (Tr. 2892.) She was visibly shaking during the appointment and spoke with a "shaky voice." (*Id.*)

At an appointment on April 11, 2024, Ms. Kaufman reported that she was "stressed out" about her disability application. (Tr. 3349.) But she described her anxiety as well-controlled and said her energy level was "fair." *Id.* On examination, Ms. Kaufman exhibited good eye contact, coherent and rational speech with good flow, euthymic mood, and appropriate and full euthymic affect. (Tr. 3349–50.)

## IV. THE ALJ'S DECISION

The ALJ determined that Ms. Kaufman had not engaged in substantial gainful activity since October 16, 2020, the alleged disability onset date. (Tr. 1846).

The ALJ next determined that Ms. Kaufman had the following severe impairments: (1) migraines; (2) cervical degenerative disc disease with reversal of lordosis with lymphadenopathy; (3) lumbar degenerative disc disease; (4) idiopathic peripheral neuropathy; and (5) "psychological conditions variously described as bipolar disorder, panic disorder without agoraphobia, posttraumatic stress disorder (PTSD), [and] insomnia"; and (6) opioid use and cannabis use disorders. (Tr. 1846.)

The ALJ also noted that Ms. Kaufman had the following non-severe impairments: obesity, gastroesophageal reflux disease (GERD), hydroureteronephrosis, and hypothyroidism. (Tr. 1846.) While the ALJ found these conditions to be non-severe, the ALJ noted that she considered all these conditions when determining Ms. Kaufman's residual functional capacity. (*Id.*)

The ALJ determined that none of Ms. Kaufman's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1847.)

The ALJ further determined that Ms. Kaufman had the residual functional capacity ("RFC") to perform work at the medium exertional level, with some additional exertional and non-exertional limitations. (Tr. 1852.)

With respect to exertional limitations, the ALJ concluded that Ms. Kaufman was further limited as follows:

> [She] can occasionally climb and stoop and frequently kneel, stoop, and crouch. She can have occasional exposure to concentrated levels of loud noise as defined in the Dictionary of Occupational Titles as well as vibrations. She cannot work around unprotected heights or unprotected moving mechanical machinery.

(Tr. 1852.)

With respect to non-exertional limitations, the ALJ concluded that Ms. Kaufman was

further limited as follows:

> [She] can understand, remember, and carry out simple tasks but not at a production rate pace such as required working on an assembly line. She can make judgments on simple work and respond appropriately to usual work situations where duties are generally stable, predictable, and short cycle and handle occasional changes in a routine work setting that are explained in advance and implemented such that she can adjust her performance to meet new task criteria and/or requirements. She cannot perform work that requires a daily production quota, i.e., piecework, but can perform goal-oriented work and meet end of day production requirements. She cannot interact with the general public. She can have occasional interaction with supervisors and coworkers. With coworkers, she cannot engage in team or tandem tasks. Further, her interactions with coworkers should be superficial in nature, defined as interactions of short duration for a specific purpose such as work-related exchanges although she can engage in casual conversation.

(*Id.*)

The ALJ found that Ms. Kaufman was 33 years old on the alleged disability onset date and had at least a high school education; she had no past relevant work. (Tr. 1858.)

The ALJ then determined that—considering Ms. Kaufman's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as a "floor waxer" (DOT 381.687-034), "hospital cleaner" (DOT 323.687-020), "cook helper" (DOT 317.687-010), "merchandise marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "housekeeping cleaner" (DOT 323.687-014). (Tr. 1858–59.)

Accordingly, the ALJ determined that Ms. Kaufman is not disabled. (Tr. 1859.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

*Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.**     **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio

Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

## C.    <u>Analysis</u>

In her assignment of error, Ms. Kaufman contends that the ALJ failed to adequately account for the opinions of the state agency medical consultants with respect to her social-interaction limitations. She points out that the consultants found that she was only able to relate to coworkers and supervisors "on a superficial level" and limited her to "occasional superficial interactions with the general public." (Tr. 71, 82.) She argues that the ALJ's social-interaction limitations were inconsistent with those opinions. The ALJ limited Ms. Kaufman as follows:

> She can have occasional interaction with supervisors and coworkers. With coworkers, she cannot engage in team or tandem tasks. Further, her interactions with coworkers should be superficial in nature, defined as interactions of short duration for a specific purpose such as work-related exchanges although she can engage in casual conversation.

(Tr. 1852.)

The ALJ, in explaining her decision, found the state agency consultants' opinions to be only somewhat persuasive. (Tr. 1857.) The ALJ reasoned that the record supported greater social

limitations than the state agency consultants identified with respect to interactions with the public. (*See* Tr. 1856.) Specifically, the ALJ concluded that Ms. Kaufman could have no interaction with the public. (*Id.*) The ALJ then noted that Ms. Kaufman could occasionally interact with supervisors and with coworkers. (Tr. 1857.) The ALJ limited Ms. Kaufman to superficial interactions with coworkers—writing that "superficial" meant "interactions of short duration for a specific purpose such as work-related exchanges and engaging in casual conversation." (Tr. 1856.) But the ALJ found that Ms. Kaufman was not limited to superficial interaction with coworkers. (Tr. 1857.) In explaining that conclusion, the ALJ reasoned that Ms. Kaufman retained the ability to interact with authority figures, at least occasionally, as evidenced by the fact that she successfully completed probation and interacted with health care providers and staff appropriately. (*Id.*)

Ms. Kaufman contends that the ALJ's explanation is not adequate. She points out that the Social Security regulations define "occasionally" to mean "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, *5. Therefore, she says, the RFC has the practical effect of limiting the *quantity* of Ms. Kaufman's interaction with supervisors without limiting the *quality* of that interaction at all. *See Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, *4 (S.D. Ohio Nov. 30, 2018); *Hummel v. Comm'r of Soc. Sec.*, No. 2:18-cv-28, 2020 WL 13572215, *4 (S.D. Ohio Mar. 13, 2020) ("Courts routinely recognize that limiting the *quantity* of time spent with an individual does not accommodate a limitation relating to the *quality* of the interactions—including a limitation to "superficial" interaction.") (emphasis in original).

Moreover, Ms. Kaufman claims that the ALJ's decision not to limit her to superficial interaction was unexplained: "There was no explanation as to why the ALJ substituted 'occasional' for 'superficial' interaction with supervisors. There was no way the ALJ's reasoning could be

traced." (Pl.'s Merit Br. at 12, ECF No. 6, PageID# 3464.) For this reason, Ms. Kaufman says, the decision must be remanded. *See Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, * 2–3 (6th Cir. May 20, 2024) ("The failure to either incorporate the limitation or explain its omission was an error.") (citing Social Security Ruling 96-8p).

The Commissioner defends the ALJ's decision, arguing that the ALJ "very clearly set forth examples of [Ms. Kaufman] interacting in a substantial manner with authority figures and her successful ability to do so." (Def.'s Merit Br. at 6, ECF No. 8, PageID# 3473.) The Commissioner points out that the ALJ acknowledged the state agency consultants' opinions, set forth her finding that their opined limitations were overstated when it came to Ms. Kaufman's ability to interact with supervisors, and adequately explained—with reference to objective evidence in the record— why the consultants' findings were unsupported. (*Id.*)

In reply, Ms. Kaufman acknowledges that the ALJ cited to treatment notes, her successful completion of probation, and her ability to attend group classes when explaining why Ms. Kaufman was not limited to superficial interaction with supervisors. But Ms. Kaufman contends that this "evidence does not, in any way, explain why a limitation to 'occasional' was more reasonable than a limitation to 'superficial' interaction with supervisors." (Pl.'s Reply Br. at 2, ECF No. 9, PageID# 3477.) Furthermore, Ms. Kaufman argues that the ALJ's evidence was outweighed by other evidence tending to show that Ms. Kaufman has trouble relating to authority figures, including (1) the fact that she was on probation in the first place and (2) her testimony that she was terminated from a position due to conflicts with supervisors and coworkers. (*Id.* at 3, ECF No. 9, PageID# 3478.)

After careful consideration, I agree with the Commissioner. As an initial matter, Ms. Kaufman is flatly incorrect that there was "no explanation" regarding the ALJ's choice not to limit

Ms. Kaufman to superficial interactions with supervisors. The ALJ acknowledged the state agency consultants' opinions limiting Ms. Kaufman to superficial interactions with supervisors (Tr. 1856), explicitly found those opinions to be only somewhat persuasive (Tr. 1857), and then specifically stated that, despite the consultants' opinions to the contrary, Ms. Kaufman was not so limited. (*Id.*) The ALJ then explained the basis for that decision. (*Id.*)

In explaining the decision, the ALJ acknowledged the evidence tending to support a greater limitation—including Ms. Kaufman's testimony that she had difficulty getting along with authority figures and had been terminated due to conflict with a supervisor. (*Id.*) But the ALJ then cited a number of records that support a lesser limitation. Specifically, the ALJ noted that Ms. Kaufman was able to successfully interact with her probation officer such that she successfully completed probation; she attended group classes where she would have been required to interact with group leaders; and she interacted with health care providers and medical staff appropriately, with one exception. (*Id.* (citing hearing testimony and Tr. 1542, 1555, 1567)).

I find that explanation sufficient. "'In rendering [her] RFC decision, the ALJ must give some indication of the evidence upon which [s]he is relying, and [s]he may not ignore evidence that does not support h[er] decision, especially when that evidence, if accepted, would change h[er] analysis.'" *Golden v. Berryhill*, No. 1:18CV636, 2018 WL 7079506, *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted*, 2019 WL 415250 (quoting *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 880 (N.D. Ohio 2011)).

That is what the ALJ did here, and Ms. Kaufman does not claim that the ALJ ignored or mischaracterized any evidence in the record. "The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No.

1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021) (quoting *Hipp v. Comm'r of Soc. Sec.*, No. 1:17-CV-0846, 2018 WL 1954361, at *9 (N.D. Ohio Apr. 5, 2018), *report and recommendation adopted*, 2018 WL 1933393).

The ALJ's explanation here distinguishes this case from those cases that Ms. Kaufman cites, in which ALJs either failed to explain their decision not to incorporate a psychologist's superficial limitation into an RFC or based that decision on legally unsound reasoning. *See Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, *4 (S.D. Ohio Nov. 30, 2018) (noting that "the ALJ failed to adequately explain why he limited Plaintiff to '*occasional* interaction with others' instead of '*superficial* contact with the public, coworkers, or supervisors'"); *Hummel v. Comm'r of Soc. Sec.*, No. 2:18-cv-28, 2020 WL 13572215, *4 (S.D. Ohio Mar. 13, 2020) (rejecting an ALJ's decision to omit a superficial limitation, which had been based on reasoning that such a limitation was "not stated in vocationally relevant terms"); *Clampit v. Comm'r of Soc. Sec.*, No. 3:20-cv-1014, 2021 WL 3174111, *2 (N.D. Ohio July 26, 2021) (ALJ failed to account for consulting opinion limiting the claimant to superficial interaction).

I am similarly unconvinced by the argument that the ALJ's choice in this regard was not supported by substantial evidence. Even where an ALJ provides "great weight" to a medical opinion, there is no requirement that an ALJ adopt the verbatim language of that opinion. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which he gave great weight); *Jordan v. Comm'r of Soc. Sec.*, No. 5:17-cv-02466, 2018 WL 5884830, at *10 (N.D. Ohio Nov. 9, 2018) ("Jordan's contention that the ALJ's RFC is not supported by substantial evidence because it does not include each and every limitation contained in the medical opinions that were assigned 'weight' is unavailing"); *cf. Calzo v. Saul*, No. 4:19CV00598, 2020 WL 2362057, at *6 (N.D. Ohio Feb. 4,

2020), *report and recommendation adopted*, 2020 WL 1041213 (holding that ALJ did not err in failing to include limitations identified by state agency psychologists because "[t]he ALJ's RFC finding does not outright *contradict* the State agency opinions, but rather, it simply *omits* the specific limitation about which they opined").

Here, the ALJ incorporated social interaction limitations in Ms. Kaufman's RFC after finding the state agency opinions to be "somewhat persuasive." The ALJ's reasons for omitting a superficial limitation with respect to supervisors was based on record evidence. Ms. Kaufman does not allege that the ALJ misstated any portion of the record. Her argument is limited to pointing to other evidence in the record that tends to support her preferred conclusion. But "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

I find that this is a case where the ALJ's decision falls within that zone of choice preventing a court from reweighing the evidence. Ms. Kaufman, in her reply brief, points to only two pieces of evidence in support of her argument—the fact that she was on probation and the fact that she had reported being terminated from previous employment due to conflicts with coworkers and supervisors. As discussed further above, the ALJ acknowledged the evidence Ms. Kaufman points

to in her briefing and reasonably explained how she balanced that evidence against the other evidence in the record.

In sum, the ALJ properly explained her RFC limitations and accounted for the state agency opinions, including the "superficial interaction" restrictions. Accordingly, I find that Ms. Kaufman's assignment of error is without merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  July 11, 2025

/s *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).